AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

## for the

### District of Connecticut

FILED

2018 MAR -9 P 12: 24

US DISTRICT COURT
BRIDGEPORT CT

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>CELLULAR TELEPHONE WITH TELEPHONE<br>NUMBERS 203-671-1294 | )<br>)<br>)<br>)<br>)<br>) |

Case No.

3:18 mj 373 (HBF)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

CELLULAR TELEPHONE WITH TELEPHONE NUMBERS 203-671-1294

located in the _____ District of _____Connecticut_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sec. 846 | Conspiracy to Possess with Intent to Distribute Controlled Substances |

The application is based on these facts:

see Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Meaghan Fallon, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____03/04/2015____

s/Holly B. Fitzsimmons

*Judge's signature*

City and state: Bridgeport, CT

Hon. Holly B. Fitzsimmons, US Magistrate Judge
*Printed name and title*

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

1. The cellular telephone assigned call number **203-671-1294** (the "**Target Telephone**"), which is provided cellular service by Verizon Wireless.

2. Information about the location of the **Target Telephone** that is within the possession, custody or control of Verizon Wireless, including information about the location of the cellular telephones and if they are subsequently assigned a different call number(s).

**Particular Things to be Seized**

All information about the location of the **Target Telephone** for a period of thirty days, during all times of day and night. "Information about the location of the **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **Target Telephone** described herein.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless is required to disclose the Location Information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the **Target Telephone** on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the

government.   The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.   In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2018 MAR -9 P 12: 24

US DISTRICT COURT
BRIDGEPORT CT

| IN THE MATTER OF THE SEARCH OF CELLULAR TELEPHONES WITH TELEPHONE NUMBERS 203-671-1294 | Case No. _____ <br><br> **Filed Under Seal** 3:18 mj 373 (HBF) |

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT

I, Meaghan Fallon, being first duly sworn, hereby depose and state as follows:

**Introduction and Background**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call numbers **203-671-1294**, which is provided service by Verizon Wireless"), and subscribed to by Steven SANTUCCI, 380 Hitchcock Rd Unit 147U, Waterbury, CT (the "**Target Telephone**"). The **Target Telephone** and the location information to be seized is described herein and in Attachment A.  This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed for approximately two and a half years.  Prior to becoming a Special Agent with the FBI, I worked for the FBI for two years as a Forensic Accountant.  I am a certified public accountant (CPA) and a certified fraud examiner (CFE).  Since joining the FBI, I was assigned to work public corruption on the White Collar crime squad in the FBI's Bridgeport Resident Agency.  I received the training that all new agents receive at the FBI's facility in Quantico,

Virginia. My training includes training relating to financial fraud investigations, corruption and civil rights. I have also attended training focused specifically on financial and investment schemes. I have participated in investigations of various federal financial crimes, corruption, civil rights and have prepared affidavits in support of arrest and search warrants and have performed the execution of search and arrest warrants.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.      The facts in this affidavit come from my personal observations, wiretap interceptions, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute controlled substances) and Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute controlled substances) have been committed, are being committed, and will be committed by unknown persons. There is also probable cause to believe that the location information described in the Attachments will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## Background

6.      In June 2013, the DEA New Haven Office received information from an anonymous source that Newtown Police Sergeant Steven SANTUCCI and fitness trainer Alex

KENYHERCZ were distributing illegal steroids. The information included physical samples of suspected steroids in liquid and capsule form. The liquid steroids were contained within glass vials and were labeled "V LABS". The capsules contained a white-colored powder. The DEA has the suspected liquid and powder steroid exhibits in evidence at the DEA Northeast Regional Laboratory pending analysis. The DEA also has documentation that in July 2011 an industrial capsule/tableting machine was shipped to SANTUCCI's residence in Waterbury, CT.

7.      In April 2014, the DEA was conducting an investigation into a steroid and oxycodone distribution organization operating in Fairfield County.  The three target members of this organization traveled to New York City several times per week to purchase oxycodone.  The organization was selling oxycodone in Connecticut and using the profits to purchase steroids for personal use as well retail distribution in Connecticut.

8.      On August 6, 2014, the DEA and Fairfield Police Department executed three State of Connecticut Search and Seizure Warrants at all three of the targets residences in Fairfield County.  The three warrants yielded thousands of dosage units of steroids both in injectable and capsule forms.  In addition, a capsule press machine, glassware, liters of liquid steroids, and raw steroid powder was seized.  All of this evidence was placed into custody with the Fairfield Police Department.  Three individuals were charged with State of Connecticut Narcotics Violations and later released on bail.  Some of the seized steroids had the brand names of "V LABS" and "CROX GEAR".

9.      During September and October 2014, the DEA interviewed two of the three defendants (hereinafter "CD-1" and "CD-2," respectively) with their attorneys present.  CD-1 stated that a prior steroid source of supply was an active Newtown police officer, later identified as Newtown Police Department Sergeant Steven SANTUCCI.  According to CD-1, SANTUCCI

3

manufactures and packages the illegal steroids for sale. SANTUCCI gets the raw materials from China and processes the raw steroids into 10cc vials ready for retail sale. According to CD-1, SANTUCCI then sells approximately 100 of the 10cc vials per week. CD-1 has not dealt with SANTUCCI since 2010 or 2011, but believes that SANTUCCI is still involved in illegal steroid importation, manufacture, and sales. CD-1 stated that SANTUCCI manufactures and distributes illegal steroids using the name and label of "V LABS" and "CROX GEAR". CD-1 also stated that SANTUCCI uses Alex KENYHERCZ to distribute the steroids in Connecticut at local gyms. The investigation had previously revealed that KENYHERCZ is a personal trainer familiar with New Haven and Fairfield county gyms.

10.    CD-2 also identified by name Newtown Police Sergeant Steve SANTUCCI as operating a steroid distribution organization. CD-2 is a close friend of KENYHERCZ, who CD-2 stated distributed steroids at the direction of SANTUCCI. CD-2 identified "V LABS" and "CROX GEAR" brand steroids as the brand name of steroids distributed by SANTUCCI and KENYHERCZ. In 2014, CD-2 stated that KENYHERCZ was purchasing $3,000 to $5,000 worth of steroids per week from SANTUCCI for distribution in Connecticut. CD-2 stated that some of the steroids seized by the DEA and Fairfield Police on August 6, 2014 were from KENYHERCZ and SANTUCCI. CD-2 further stated that KENYHERCZ lives with his parents in Ansonia, Connecticut. According to CD-2 said that KENYHERCZ meets with SANTUCCI from whom KENYHERCZ takes steroids on consignment, and then distributes the steroids at various locations in Connecticut. CD-2 then provided DEA with the cellular telephone numbers that KENYHERCZ used to distribute steroids.

11.    During this same time, DEA had a Cooperating Source, hereafter referred to as CS, who was providing information on steroid distributors including CD-1, CD-2, and

KENYHERCZ.  Based on this information, DEA directed the CS to make contact with KENYHERCZ in furtherance of a controlled purchase of steroids.  The CS was not able to obtain a contact number for KENYHERCZ.  The CS, however, knew an ex-roommate of KENYHERCZ, Mark BERTANZA.

12.     During October 2014, the CS provided DEA with BERTANZA's cellular telephone of 203-676-1609, (hereinafter "Bertanza's cellphone").  The CS was then directed to make contact with BERTANZA in furtherance of a controlled purchase of steroids.  The CS did in fact make cellular telephone contact with BERTANZA, which included voice conversations as well as text messages over the BERTANZA'S CELLPHONE.  BERTANZA explained to the CS that KENYHERCZ has a bad prescription drug problem that was detrimentally impacting his ability to distribute steroids for his source.  BERTANZA further explained that KENYHERCZ received the steroids on consignment and was not repaying his source. In substance, BERTANZA described KENYHERCZ as a "Pill Junkie", unable to be responsible with the steroids sales.  BERTANZA further told the CS that he has the same source of supply as KENYHERCZ and would be able to supply the CS with, "the same stuff."

13.     Between November 17, 2014 and December 17, 2014, the CS, at the DEA's direction, made controlled purchases of steroids from BERTANZA.

14.     I have seen SANTUCCI's credit card records and have been in contact with Special Agents from the Department of Homeland Security.  Based on these records, I am aware that SANTUCCI flew to Quito, Ecuador on January 9, 2015 and returned to the United States from Lima, Peru on January 24, 2015.

15.     On January 23, 2015, at approximately 2:24 p.m., the CS contacted BERTANZA on  BERTANZA'S CELLPHONE and discussed the wholesale purchase of steroids.

BERTANZA stated that his source of supply had demanded that the CS "front" money for the steroids purchase and the CS asked to meet the source of supply. BERTANZA refused but said he would contact his source of supply.

16.     Immediately after the telephone call, BERTANZA exchanged text messages with the CS in which the CS described the quantity and type of steroid the CS wished to purchase.

17.     Toll record analysis shows that during this exchange, BERTANZA'S CELLPHONE contacted the KENYHERCZ's telephone seven times, including two telephone calls of over one minute and five text messages between 2:26 p.m. and 2:49 p.m.

18.     On January 26, 2015, the CS called BERTANZA on BERTANZA'S CELLPHONE. The two arranged to meet in Shelton, CT. Surveillance observed BERTANZA meet the CS in a parking lot in Shelton, CT.

19.     At approximately 11:36 a.m., KENYHERCZ sent a text message to BERTANZA'S CELLPHONE stating: "He said still on pace and every minute he is texting me is time he is making stuff lol." Based on my training and experience, I believe that KENYHERCZ informed BERTANZA that he had spoken to SANTUCCI who believed that he could manufacture steroids ("making stuff") at a rate ("pace") sufficient to provide the quantity discussed with CW-1, but that the time SANTUCCI spent "texting" KENYHERCZ is time he could spend manufacturing the steroids ("making stuff").

20.     During the meeting, BERTANZA advised the CS that law enforcement officers may be in the area and agreed to meet the CS at another location in Shelton, CT. At the second location, BERTANZA informed the CS that they should meet in Derby, CT, where BERTANZA would meet a "runner" for the steroid source of supply.

21.     At approximately 3:42 p.m., BERTANZA'S CELLPHONE sent a text message to KENYHERCZ's telephone stating, "The longer he takes the more likely this won't happen. This weirdo stretchy." Based on my training and experience, I believe that this text message involves BERTANZA explaining to KENYHERCZ his concern with the length of time that SANTUCCI was taking to bring the steroids to KENYHERCZ and BERTANZA.

22.     Surveillance was established at the third meeting location and observed KENYHERCZ meet with BERTANZA. BERTANZA then told the CS that the "runner" was going to meet the steroid source of supply.

23.     At approximately 5:08 p.m., KENYHERCZ sent a text message to BERTANZA's CELLPHONE stating, "I'm on the phone with him now. Prius slid off highway on 8 had a tire blow out where he slid." Based on my training and experience, I believe that KENYHERCZ informed BERTANZA that he was speaking to SANTUCCI and SANTUCCI's Toyota Prius slid off the highway on Connecticut Route 8, which runs north and south and connects Waterbury to Shelton, where the purchase was to take place. I am aware through information provided by CD-1, information from financial records and information from the State of Connecticut Department of Motor Vehicles that Steven SANTUCCI owns and has registered a blue colored 2010 Toyota Prius.

24.     At approximately 5:09 p.m., KENYHERCZ sent a text message to BERTANZA'S CELLPHONE stating, "He is changing tire he said I could run and meet him in Naugatuck or he said he will front me the product and I can run and drop it off." Based on my training and experience, KENYHERCZ informed BERTANZA that he had communicated with SANTUCCI who was changing his tire. SANTUCCI had informed KENYHERCZ that he could

meet him in Naugatuck, or he will loan ("front") KENYHERCZ the steroids to sell ("the product") and KENYHERCZ would drop the steroids off with BERTANZA.

25.    At approximately 6:18 p.m.., KENYHERCZ sent a text message to BERTANZA'S CELLPHONE stating: "Fuck it fuck seriously I can blame Steve I'm driving around in a fucking blizzard BC this kid had to be winey bitch.  Dude I can only go so fucking fast."  Based on my training and experience, I believe that KENYHERCZ informed BERTANZA that he had not yet reached SANTUCCI ("Steve") because of white-out snow conditions, which were the contemporaneous weather conditions at the time of the text.

26.    Toll record analysis shows that just before the first meeting in Shelton, the KENYHERCZ telephone made a 36 second telephone call to the **Target Telephone**. Additionally, between 2:00 p.m. and 9:00 p.m. that same day, BERTANZA'S CELLPHONE and the KENYHERCZ telephone exchanged approximately 70 text messages and 11 telephone calls.

27.    On January 26, 2015, the DEA asked Verizon Wireless to preserve all text messages on BERTANZA'S CELLPHONE from January 17, 2015 to January 26, 2015.

28.    On February 1, 2015, KENYHERCZ sent a text message to BERTANZA'S CELLPHONE stating:  "Anything as far as that.  I met Steve I have product.  I'm at cousin for Superbowl will be home in am."  Based on my training and experience, I believe KENYHERCZ was informing BRETANZA that he had met with SANTUCCI ("Steve") and had enough steroids ("product") to fulfill CW-1's request.

29.    On February 2, 2015, KENYHERCZ sent a text message to BERTANZA'S CELLPHONE stating:  "Get the order n I'll tell this dude.  We will have wAitin this time. K" Based on my training and experience, I believe KENYHERCZ directed BERTANZA to get CW-

1's order and that he would tell SANTUCCI ("this dude") and that they would have the steroids ready for delivery at the meeting ("We will have wAitin this time").

30.    On February 3, 2015, at approximately 3:20 p.m., BERTANZA'S CELLPHONE sent a text message to KENYHERCZ stating: "Wanna take a ride to get the z." Based on my training and experience, I believe BERTANZA asked KENYHERCZ if he would go ("take a ride") to get the steroids ("z") he had picked up from SANTUCCI so that BERTANZA could sell the steroids to CW-1.

31.    On February 3, 2015, at approximately 6:25 p.m., the DEA met with CW-1 to complete the purchase. Prior to the controlled purchase, CW-1 and CW-1's vehicle were searched for contraband or unaccounted for monies. The searches were negative. CW-1 was then given $4,000.00 of serialized DEA funds to purchase the steroids and pharmaceuticals from BERTANZA.

32.    DEA conducted surveillance of the meeting between BERTANZA and CW-1 in the parking lot of the Edge Fitness in Shelton, CT.

33.    After the meeting, agents then met with CW-1, who turned over 50 vials of liquid steroids, 10 Xanax pills, $170 in unused funds and change, and the covert audio recorder and the covert audio/video recorder. CW-1 and CW-1's vehicle were searched for contraband and unaccounted for monies with negative results.

34.    The surveillance operation on BERTANZA continued as DEA observed BERTANZA meet with one other individual, to complete a transaction, and then drove to the Outback Steakhouse in Shelton, Connecticut, where he met an individual in a car registered to Robert Kenyhercz.

35.     On February 19, 2015, the DEA directed CW-1 to contact BERTANZA via text message.  CW-1 sent BERTANZA text messages stating that CW-1 wanted to purchase approximately $500 worth of Trenbolone and Testosterone steroids from BERTANZA.  CW-1 and BERTANZA agreed to meet at the Edge Fitness Club parking lot at 862 Bridgeport Avenue, Shelton, Connecticut at around noon the following day. All of the communications between CW-1 and BERTANZA were via text message, and I verified them by observing them on CW-1's telephone and through the toll records. There were a total of 12 text messages between them on February 20, 2015.  Four occurred between 10:03 a.m. and 10:09 a.m.  At 10:05 a.m., there was a 3 minute and 24 second call between BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE. That call occurred in the middle of the four text messages between CS and BERTANZA'S CELLPHONE. Two text messages between CS and BERTANZA'S CELLPHONE occurred at 11:44 a.m. and read as follows: CS texted BERTANZA'S CELLPHONE, "Im heading out in 5min..ill be there by 1205pm. k?" BERTANZA'S CELLPHONE immediately responded, "Ok." The next six texts occurred before the controlled meeting, and the last one occurred at 12:14 p.m., one minute before surveillance observed CS meet with BERTANZA. Though I viewed the text messages between CS's telephone and BERTANZA'S CELLPHONE on CS's telephone at the time they were sent and received, I did not photograph them at the time and will be meeting with CS at some point in the near future to photograph those text messages.

36.     The initial two text messages between CS and BERTANZA'S CELLPHONE consist of CS arranging to purchase steroids that day from BERTANZA. Immediately following the two telephone text messages there is an approximate three and a half minute telephone call between BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE.  Immediately

10

following the telephone call between BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE there are two additional text messages between BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE. Given the timing of the calls between BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE as they relate to the contacts between CW-1 and BERTANZA'S CELLPHONE, and based on my training and experience and information I have learned during the course of this investigation, I believe that BERTANZA and KENYHERCZ were discussing the steroid transaction to take place between CW-1 and BERTANZA. With respect to the telephone calls taking place subsequent to the transaction between BERTANZA'S CELLPHONE and CS, I believe that BERTANZA and KENYHERCZ were discussing additional details of the steroids transaction to possibly include the division of proceeds and or commissions of the sale.

37.     On February 20, 2015, at approximately 11:38 a.m., the DEA met with CS to complete the purchase.  Prior to the controlled purchase, CS and CS's vehicle were searched for contraband or unaccounted for monies.  The searches were negative.  CS was then given $500.00 of serialized DEA funds to purchase the steroids from BERTANZA.  During this time members of the DEA, FBI, and HSI established surveillance in the Edge Fitness Club parking lot.

38.     At approximately 12:15 p.m., surveillance observed CS and BERTANZA meet in the parking lot of the Edge Fitness Club in Shelton, Connecticut.  Surveillance observed BERTANZA exit his red Ford pickup truck and enter CS's vehicle.  At approximately 12:19 p.m., surveillance observed BERTANZA exit CS's vehicle, enter his red pickup truck, and depart the area.

39.     After the meeting, agents then met with CS, who turned over six vials of liquid steroids and the covert audio recorder and the covert audio/video recorder. CS and CS's vehicle

were searched for contraband and unaccounted for monies with negative results.  As stated above, CS turned over a plastic "zip-lock" type bag containing 6 glass vials of steroids to DEA. Two of the bottles of suspected steroids were contained within a second "sandwich" type plastic bag and four of the vials of suspected were contained within the plastic "zip-lock" type bag.  The plastic "sandwich" type bag contained 2 bottles labeled "V Labs" and "Trenbolone Enanthate." The plastic "zip-lock" type bag contained two bottles labeled "ProStock" and "Pro Trenbolone" and two bottles labeled "ProStock" and "Mastron Enanthate."  DEA has sent these drug exhibits to the DEA lab for analysis.

40.     CS stated that he/she paid BERTANZA $500 for the six vials and that BERTANZA had two additional vials on his person.  CS stated, in substance, that BERTANZA would not give CS the additional two vials of steroids on consignment.

41.     Following the controlled purchase of steroids, investigators conducted telephone toll record analysis of BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE. Investigators identified exchanges of text messages between CS and BERTANZA'S CELLPHONE as well as exchanges of text messages and telephone calls between BERTANZA'S CELLPHONE and KENYHERCZ'S CELLPHONE. Investigators note that on the morning of the controlled purchase in which CS purchased steroids from BERTANZA, there is telephone text message and telephone calls between KENYHERCZ'S CELLPHONE and the **Target Telephone**. Investigators also note an approximate 30 second telephone call and an approximate three minute long telephone call between KENYHERCZ'S CELLPHONE and the **Target Telephone** preceding the controlled purchase taking place approximately one half hour before the controlled purchase. Based on my training and experience and information I have learned during the course of this investigation, I believe that the telephone contact between

KENYHERCZ'S CELLPHONE and the SANTUCCI phone, given the timing of the calls as they relate to the controlled purchase by CS, involve KENYHERCZ and SANTUCCI discussing details of the pending drug transaction between CS and BERTANZA. Specifically, the calls and text messages between KENYHERCZ'S CELLPHONE and the SANTUCCI phone took place at: 8:43 a.m. (text message), 11:32 a.m. (32 second phone call), 11:42 a.m. (3 minute, 19 second phone call) and 4:52 p.m. (18 second phone call). The last contact between KENYHERCZ'S CELLPHONE and the **Target Telephone** occurred after the controlled buy. Given the fact that, on this controlled purchase (and with all other controlled purchases between CS and BERTANZA), CS did not front monies to BERTANZA, I believe that the nature of the pre-buy communications would be focused on the details of the delivery of the steroids and that the details of the post-buy communications would be focused on the division of the monies for KENYHERCZ and SANTUCCI. As previously referenced in this affidavit, there are text messages in which KENYHERCZ and BERTANZA discuss the profits and commissions to be provided to BERTANZA, KENYHERCZ and SANTUCCI. For example, the following text message communication (obtained via search warrant) occurred on January 25, 2015 and was sent from KENYHERCZ'S CELLPHONE to BERTANZA'S CELLPHONE, "Yes 54 that his cut. Like I said I only want 5 per after u get yours." I believe this text message is an example of the discussion of the split of profits among BERTANZA, KENYHERCZ and SANTUCCI.

**Request for Authorization**

42.    In my training and experience, I have learned that Verizon Wireless (the "provider") is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular

telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

43.     Based on my training and experience, I know that the provider can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on the providers networks or with such other reference points as may be reasonably available.

44.     Based on my training and experience, I know that the provider can collect cell-site data about the **Target Telephone**.

45.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

46.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber(s) or user(s) of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give those individuals an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in the Attachments, which is incorporated into the warrant, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

47.     I further request that the Court direct the provider to disclose to the government any information described in the Attachments that is within the possession, custody, or control of the providers. I also request that the Court direct the providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in the Attachments unobtrusively and with a minimum of interference with the providers, including by initiating a signal to determine the location of the **Target Telephone** on the provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the provider's for reasonable expenses incurred in furnishing such facilities or assistance.

48.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephone** outside of daytime hours.

49.     I further request that the Court order that all papers in support of these Applications, including the Affidavit and Search Warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation by revealing the existence of the ongoing wiretap.

Respectfully submitted,

Special Agent Meaghan Fallon
Federal Bureau of Investigation

Subscribed and sworn to before me this ___4th___ day of March 2015

s/Holly B. Fitzsimmons

HONORABLE HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number **203-671-1294** (the "**Target Telephone**"), which is provided cellular service by Verizon Wireless.

2. Information about the location of the **Target Telephone** that is within the possession, custody or control of Verizon Wireless, including information about the location of the cellular telephones and if they are subsequently assigned a different call number(s)**.**

**Particular Things to be Seized**

All information about the location of the **Target Telephone** for a period of thirty days, during all times of day and night. "Information about the location of the **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **Target Telephone** described herein.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless is required to disclose the Location Information to the government.  In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the **Target Telephone** on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the

government.   The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.   In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).